JUSTICE TRIEWEILER
dissenting.
It’s gotten so that between tennis shoes (see State v. Mummey (1994), 264 Mont. 272, 871 P.2d 868) and backpacks, it’s just not safe to leave your house anymore.
Nevertheless, Article II, Section 10, of the Montana Constitution, provides as follows:
Right of privacy. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.
Article II, Section 11, of the Montana Constitution provides:
Searches and seizures. The people shall be secure in their persons, papers, homes and effects from unreasonable searches *58 and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.
These provisions are set forth in this dissent in their entirety because their clarity of purpose is otherwise lost in the maze of governmental and judicial rationalizations for their erosion and eventual elimination. The majority opinion is simply the most recent example of those ill-founded rationalizations.
It should not be necessary to cite over ten other decisions to apply these clear provisions to the facts in this case.
I would conclude that there was no compelling state interest for invading the privacy of the defendant after he had been arrested and was no longer in control of his property. I also conclude that there was no probable cause for searching the defendant’s property and that the facts in this case did not present any legitimate exception to the requirement that before his effects are searched by governmental officials, probable cause be shown and a search warrant obtained.
Before further discussion, it is necessary to clarify what this case is not about. Without foundation, authority, or reference to anything other than the sensationalized news coverage provided by the commercial media, the majority opinion takes judicial notice that:
There is little doubt that we live in a violent society. Hardly a week goes by without news reports of workers, public officials, employees and other innocent citizens being injured or killed in indiscriminate assaults in offices, work places, schools, restaurants, courtrooms, police stations and other private or public institutions. Whether it be the White House or the doctor’s office, sadly, no citizen or property is, today, immune from attack by the deranged, the disaffected, the misguided, the terrorist or the zealot.
The majority opinion stands for a new principle of constitutional law which is that a compelling state interest can be established based on the majority’s interpretation of what they see on the evening news.
Presumably, based on these generalized concerns, a rationalization could be set forth for the suspension of all constitutional rights. Certainly, if a backpack brought into a police station is potentially dangerous, it would be equally dangerous if brought into a school yard, basketball game, doctor’s office, or any other government building. Based on the majority’s alarm at the general state of affairs in this Country (at least as reported on CNN), everyone, everywhere *59 should be searched. There is no way to distinguish the defendant in this case from any other citizen.
This case is not about someone who came to the police station making threats. It is not even about someone who expected to come to the police station.
This case is not about someone arrested for a violent act. It is not even about someone arrested in the act.
This case is not about someone with a violent history, nor any history of using weapons. Nor is it about what other members of the court may have seen on the evening news involving some other person under other circumstances.
This case is not about anyone who the police had any reason to suspect might have a bomb, a gun, a knife, or any other weapon in his backpack.
This case is about someone who was unexpectedly arrested for failure to pay a city court fine, and who, at the time of his arrest, was walking down a public street, minding his own business, but who, unfortunately, did not have enough money to post a minor bond after his arrest.
This case is about a police station pretext for invading the defendant’s privacy by going on a fishing expedition and digging through his personal effects without any reason to suspect that the police needed to do so.
There was no more reason to suspect that the defendant had concealed weapons, dangerous instrumentalities, explosives or incendiary or hazardous substances in his backpack than there was to suspect any other person walking down the street wearing a backpack. The danger of some unexpected incendiary or explosive device detonating in a police station was no greater than the danger of a similar device detonating at any other location where people carry backpacks.
The majority’s rationale for searching the defendant’s backpack applies to every backpack worn by every person at every location in the country.
The majority reasons that if a backpack contains a weapon, the arrestee could recover the weapon after his release and use it against police officers. However, if the arrestee is lawfully in possession of a weapon, the police have to give it back to him when he is released anyway. Furthermore, the police have a right to retain all of defendant’s possessions while he is in custody. They do not need to search the backpack in order to recover weapons that are inside. Once the *60 backpack was taken from defendant’s possession, the State’s interest in regulating the jail environment was protected, and no further intrusion was necessary.
The majority also discussed the State’s interest in protecting an arrestee’s property by accounting for his possessions at the time he was placed in jail. However, if it is the arrestee’s interest that the State is concerned with, then the arrestee should have the option of either waiving his right to privacy or assuming the risk that some of his possessions might be gone when he is released. The assumption that the State has a greater interest in protecting the defendant’s property than he has himself, impresses me as a classic example of a pretext for invading someone’s privacy. This transparent justification was best disposed of in State v. Sawyer (1977), 174 Mont. 512, 571 P.2d 1131, overruled on other grounds by State v. Long (1985), 216 Mont. 65, 69, 700 P.2d 153, 156, where we stated:
It would be anomalous to justify a search of an automobile to be for the owner’s benefit, when the owner is available but does not consent to the search. Surely the property owner is an adequate judge of the treatment of the property that would most benefit him.
Sawyer, 571 P.2d at 1134.
The majority’s concerns about jailhouse safety and the well-being of the arrestee were appropriately analyzed by the Supreme Court of Alaska in Reeves v. State (Alaska 1979), 599 P.2d 727. That case presented facts nearly identical to those in this case. The defendant in Reeves was arrested for driving under the influence of alcohol. However, after his arrest, the arresting officer learned of an outstanding bench warrant because of Reeves’ failure to appear in connection with a traffic violation. He was transferred to the police station for sobriety testing where he was searched prior to incarceration. As a result of the search, an opaque balloon which contained a brownish colored powdery substance was removed from his pocket. The contents were examined, and the police ultimately learned that it was an illegal drug. The issue decided by the Alaska Supreme Court was whether pre-incarceration inventory searches, like the one conducted in this case, violated Article I, Section 14, of the Alaska Constitution, which is similar to the first sentence in Article II, Section 11, of the Montana Constitution.
First, addressing the majority’s apparent conclusion that invasions of privacy are somehow preferable if they are routine, rather than with a specific intent to discover evidence, the Alaska Supreme Court stated that:
*61 [T]here can be no doubt that a pre-incarceration inventory procedure such as that followed in this case is a “search” in the sense that the term is employed in article I, section 14 of the Alaska Constitution. The governmental intrusion inherent in a pre-incarceration inventory search of an arrestee’s person is no less an intrusion because it is routine in nature. Nor does the fact that such an inventory is conducted at least in part for the purpose of securing and protecting the arrestee’s property alter the fact of intrusion.
Reeves, 599 P.2d at 733 (emphasis added) (footnote omitted).
The Alaska Supreme Court noted that based on interpretations by the United States Supreme Court, the Fourth Amendment to the United States Constitution does not prohibit inventory searches, but in a responsible approach to interpreting and preserving its own constitutional protections, stated that:
As we have frequently noted, the Alaska constitutional guarantee against unreasonable searches and seizures is broader in scope than fourth amendment guarantees under the United States Constitution, at least in part because of the more extensive right of privacy guaranteed Alaskan citizens by article I, section 22 of our state constitution.
Reeves, 599 P.2d at 734 (footnote omitted).
We, likewise, have an extensive right of privacy guaranteed by the Montana Constitution at Article II, Section 10.
The Alaska Supreme Court, appropriately began its discussion by reiterating the fundamental principle of privacy law that “ ‘a search without a warrant is per se unreasonable unless it clearly falls within one of the narrowly defined exceptions to the warrant requirement.’ ” Reeves, 599 P.2d at 735 (quoting Erickson v. Alaska (Alaska 1973), 507 P.2d 508, 514). The court then went on to point out that:
There are two valid justifications for allowing a pre-incarceration inventory search exception to the warrant requirement. The first is the institutional interest in prohibiting the introduction of weapons, illegal drugs, and other contraband or potentially dangerous items into the jail environment. The second is the protection of the arrestee’s property and the related interest of the jail administration in protecting itself against claims that loss or damage to that property occurred while the property was under the control of jail authorities.
Reeves, 599 P.2d at 735.
*62 With regard to the first concern, the Alaska court held that it is addressed when the arrestee is required to surrender any items on his possession prior to incarceration, but that that interest is not furthered by searching those items after they are taken from the arrestee’s possession. The Alaska court held that:
Whatever the contents of the balloon, once the balloon was removed from Reeves’ person the institutional interest in regulating the jail environment was protected and no further intrusion was necessary.
Reeves, 599 P.2d at 736.
With regard to the second valid concern, which was protection of the arrestee’s property or protecting the State from invalid claims of damage to that property, the Alaska court noted that:
An arrestee’s property can be sufficiently protected simply by placing it in a “property bag,” as was apparently the practice at the jail involved here, or other segregated, secure place or container and storing it in a reasonable manner. If, as the state suggests, there is some question whether any items of the arrestee’s property are particularly fragile or perishable, or otherwise unamenable to normal storage and handling, the arrestee could so inform the correctional officer conducting the search in response to an appropriate inquiry. However benevolent the state’s intentions in this regard, the possibility that an item of the arrestee’s property might require special care, handling, or storage cannot serve as a justification for a general search of the arrestee’s possessions.
... The state can effectively insulate itself against fraudulent claims by simply listing by description any items of property taken from an arrestee; securing those items in a property bag or other secure storage container used in the facility, preferably in the arrestee’s presence; and obtaining the arrestee’s signature acknowledging the correctness of the inventory so taken. If there is any question as to the contents of any container, the arrestee should be “consulted and offered the opportunity to request that an inventory be made of the contents” of such containers. We think the above procedure and limited search fairly and reasonably protects the state against fraudulent claims.
Reeves, 599 P.2d at 736-37 (footnotes omitted).
In conclusion, the Alaska court held that pursuant to its constitutional right to be free from unreasonable searches and seizures:
*63 The search of an arrestee’s person should be no more intensive than reasonably necessary to prevent the entry of weapons, illegal drugs, and other contraband or potentially dangerous items into the jail. Any items taken from the arrestee’s possession in this search may not be further searched or opened except pursuant to a search warrant or another recognized exception to the warrant requirement applicable in the circumstances. Finally, the inventory conducted shall consist of a cataloging of the arrestee’s property thus seized and may not, without a specific request from the arrestee, extend to a search and inventory of the contents of any object, closed or sealed container, luggage, briefcase, or package.
jReeves, 599 P.2d at 737-38.
I agree with these conclusions and observations set forth by the Supreme Court of Alaska in Reeves v. State. Interestingly, so did the rest of this Court at one time. See State v. Sierra (1985), 214 Mont. 472, 692 P.2d 1273 (where we declined to march lock-step with the same U.S. Supreme Court with which today we gladly march lockstep.) The only thing that has apparently justified a reversal of our previous constitutional analysis is a concern for hidden bombs based on what some of the members of the majority have observed on television.
If I understand the basis for the majority’s conclusion that there was a compelling State interest to invade defendant’s privacy by searching his backpack, it is that based on news reports of other violent incidents by other people elsewhere in the country, there is a reasonable possibility that this defendant, who was minding his own business when he was removed from the street for failing to pay city fines, and taken to the police station against his will and without any prior plan to go there, might have had a bomb in his backpack which, if stored, could explode and harm the police. What I do not understand is why the danger presented once defendant arrived at the police station was any greater than the danger presented before he arrived.
For example, under the majority’s rationale, why wait until the police and defendant arrived at the police station. Couldn’t the bomb have caused just as much damage if it blew up while in the police car?
Who should be allowed to open sealed packages that are inventoried in police stations? Should ordinary desk clerks be allowed to handle inventory searches, or should special training in the handling of explosives be required?
*64 What about backpacks being worn at other locations by other people? In light of what we see on the news, are any of them safe? If not, should they be allowed?
In short, the possibilities for invading the privacy of Montana’s citizens under the majority’s rationale are endless. To make people in this country really safe we could suspend the entire bill of rights and then all they would have to worry about is being safe from the government. If we are going to do that, I wish the majority would rely on a little better authority than what it has seen on the evening news.
Since in this case we appear to have a smorgasbord of precedent from which to choose, I would conclude that the better reasoned opinions — those that are more consistent with my higher regard for the State Constitution than the U.S. Supreme Court apparently has for the Federal Constitution — are our decisions in Sierra and Sawyer. I would reverse State v. LaMere (1987), 226 Mont. 323, 735 P.2d 511, which is poorly reasoned, fails to distinguish prior inconsistent cases, and does not give proper regard to the greater right of privacy found in the Montana Constitution.
For these reasons, while I conclude that the District Court’s order is better reasoned than some of our prior cases, and while I believe it is a correct interpretation of this Court’s prior decisions, I would reverse the order of the District Court which denies defendant’s motion to suppress, and I dissent from the majority’s decision to affirm it.
JUSTICE HUNT joins in the foregoing dissenting opinion.